UNITED STATES *v.* FEARON DANIEL Co. (No. 1421).[1]

CHINA GOAT HAIR:

   The question for determination is almost entirely one of fact, and on a review of the testimony it is held the merchandise is China goat hair, not wool, and as such was entitled to free entry under paragraph 583, tariff act of 1909.

United States Court of Customs Appeals, February 12, 1915.

APPEAL from Board of United States General Appraisers, Abstract 35843 (T. D. 34548).

[Affirmed.]

 *Bert Hanson,* Assistant Attorney General, for the United States.
 *Curie, Smith & Maxwell (Thomas M. Lane* of counsel) for appellee.

   Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The importation involved in this case consisted of two lots of merchandise, one comprising 60 bales marked "H. K. S. M.," the other

---

comprising 59 bales marked "G. H." They were invoiced together as "animal hair," and free entry therefor was claimed by the importers under paragraph 583 of the tariff act of 1909.

The appraiser, however, reported that the merchandise was in fact "hair of China sheep, wool of the third class," valued at less than 12 cents per pound, and therefore dutiable at the rate of 4 cents per pound under paragraph 370 of the act. The collector accordingly refused free entry to the merchandise and assessed the same with duty at the rate of 4 cents per pound.

The importers filed their protest against the assessment, claiming the merchandise to be hair of the China goat and therefore entitled to free entry under the provisions of paragraph 583, *supra.*

The following is a copy of the paragraphs in question:

370. On wools of the third class and on camel's hair of the third class the value whereof shall be twelve cents or less per pound, the duty shall be four cents per pound. On wools of the third class, and on camel's hair of the third class, the value whereof shall exceed twelve cents per pound, the duty shall be seven cents per pound.

583. Hair of horse, cattle, and other animals, cleaned or uncleaned, drawn or undrawn, but unmanufactured, not specially provided for in this section; and human hair, raw, uncleaned, and not drawn.

The protest was submitted upon evidence to the Board of General Appraisers and was sustained as to both lots of the importation. The Government thereupon appealed from the board's decision in so far as the same related to the lot of 60 bales marked "H. K. S. M." That part only of the importation is thus brought before the court for review.

From the foregoing statement it readily appears that the present question is almost entirely one of fact, the importers claiming the merchandise in question to be China goat hair, while the Government claims it to be China sheep wool. It is conceded by the Government that the merchandise would be entitled to free entry if shown by the testimony to be composed entirely of China goat hair; on the other hand, the importers concede that the merchandise would not be free if composed of China sheep wool.

At the trial before the board the importers examined five witnesses, namely, Joseph H. Kenworthy, who had been in the business of buying and selling wool and hair at wholesale in this country for 25 years; Walter H. Mote, who had been a broker engaged in selling wool and hair at wholesale in this country for 12 years; William D. Oelbermann, who had been in the wool and hair business in this country for 13 years, buying and selling the same at wholesale, dealing at present in China goat hair; Emil Erlanger, who had been engaged for some years in importing merchandise from China, including China wool, goat hair, and goatskins with hair upon them, and who had been in China engaged in the export business for the preceding 6

years; and Victor G. Hofbauer, who had been a wool broker in this country for 5 years, engaged in buying and selling wool and hair, including China wool and China goat hair, in wholesale quantities. Nothing appears in the record to reflect upon the good faith or intelligence of any of these witnesses, although some of them had been interested as brokers in the present importations.

The testimony of these witnesses is to the effect that China goat hair, off the skin, has not been a subject of large or frequent importations into this country; that goatskins are generally exported from China with the hair on; that goats are raised in China for their skins and that the hair is in the nature of a by-product. The witnesses seem to have been well qualified to speak as experts upon the subject in hand and their testimony strongly sustained the claim that the merchandise in question was China goat hair and was not wool from the China sheep. According to their testimony the two separate lots in question before the board were essentially similar in character. They testified that hair from the China goat lacks the oiliness and kinkiness of China sheep wool, and is coarser, harsher, straighter, and drier than the latter. It is also incapable alone of the same uses as wool in respect to carding, combing, and spinning. It also appears from their testimony that upon some goatskins there is a certain quantity of new or immature hairs, forming a woolly undergrowth, which in time become straight and long like the other hairs, and are not wool either in fact or in commerce. The witnesses identified a small part of the importation as belonging to that class of hairs.

On the other hand, the Government also examined five witnesses upon the issue before the board. Four of these, namely, William A. Quinton, Joseph Sievers, James McKissock, and William R. Cahill, were official wool or hair examiners at the ports of Boston, New York, or Philadelphia. The four examiners testified that the merchandise in question, including both lots alike, was not China goat hair, but was from the China sheep. According to their testimony China sheep of certain kinds or conditions produce a considerable quantity of hair of a low grade which is not classifiable as wool, the same sheep producing also at the same time a greater or less quantity of finer hairs such as are wool. According to their testimony, taken together, the present importation, including both lots alike, was composed mostly of such China sheep hair with a small percentage, possibly 10 per cent, of such China sheep wool intermingled therewith. These two articles, according to the witnesses, were inseparably intermingled, and the entire merchandise was therefore passed as wool, although the hair component if imported alone might have been entitled to free entry.

The following extracts are taken from the testimony of Examiner Joseph Sievers, who passed the present merchandise:

Q. Look at Exhibit 2 and please state whether your examination enables you to say if the stuff is hair or wool?—A. It contains some wool.

Q. How much?—A. It is impossible to state.

Q. Did you return the invoice in question?—A. I did; yes, sir.

Q. As what?—A. As wool.

Q. You speak of the merchandise as being a mixture—a mixture of what?—A. It is so poor——

Q. I say, which prevails, the wool or the hair, in the mixture?—A. The hair is mixed through the wool.

Q. I say, which prevails in the mixture, wool or hair?—A. Wool.

Q. Do you receive importations of China goat hair from time to time?—A. That is not my line.

Q. Does it come before you for examination?—A. Excepting when the regular examiner is away; it does sometimes.

Q. And China wool comes to you in any event?—A. Yes.

  *       *       *       *       *       *       *

By Mr. LAWRENCE: Is there any doubt in your mind that the wool is the prevailing content in that mixture?—A. Well, wool isn't the largest per cent; but wool rules, because there is wool in it.

Q. What do you mean by that?—A. I mean to say that these—that there is a small percentage of wool showing through that shipment.

By General Appraiser McCLELLAND: Is there more hair than wool?—A. More of what we call hair than wool; yes, sir.

Q. How much more, would you say?—A. Oh, that—I don't know.

Q. Approximately?—A. Well, 10 or 15 per cent of wool; it would be impossible to say; it would be impossible to take it out and make your estimate.

  *       *       *       *       *       *       *

Q. Are you familiar with the characteristics of China hair?—A. I certainly am.

Q. How have you acquired that familiarity?—A. Because I have handled it.

Q. You mean in a commercial way, or as an examiner, or both?—A. As an examiner.

Q. Do you find that China hair as a rule possesses hair the quality of this merchandise?—A. I find China hair to be contained in that sample; yes.

Q. Does this sample possess the qualities that China hair does not possess?—A. It does.

Q. What are those?—A. That is the wool part.

Q. Describe the qualities again.—A. Wool shows as being bulkier and softer.

  *       *       *       *       *       *       *

Q. Will you pick out for us the quantity of what you say is wool?

(The witness picks out samples of wool.)

Q. This article that you have picked out [Exhibit 1], is the article you referred to as wool, is it?—A. Yes, sir; it comes right along as China wool.

Q. That you say is scattered through this shipment?—A. Yes, sir.

General Appraiser McCLELLAND. Put it in an envelope.

Mr. LANE. I will ask to have it marked "Illustrative Exhibit C."

(Sample is marked "Illustrative Exhibit C," etc.)

Q. Can you state from any examination that you have made that there is in these exhibits over 10 per cent of the article like Exhibit C?—A. That would be simply a physical impossibility to say.

Q. You conceded that in quantity the great majority of these exhibits, or the great preponderence of these exhibits, is made up of what is concededly hair?—A. Concededly hair.

Q. Isn't it true that all hair, all goat hair, contains more or less of a wooly undergrowth?—A. No, sir.

The following extracts are taken from the testimony of Examiner William R. Cahill:

Q. I believe you said that the growth on sheepskins was made up of more or less hair and wool?—A. Yes, sir.

Q. And as the sheep deteriorates the hair becomes more and more common, does it?—A. Yes, sir.

Q. When you get in the realm of the mocha sheep you get a sheep that contains hair on its pelt, don't you?—A. The mocha sheep is principally hair.

Q. Made up principally of hair?—A. Yes, sir.

Q. When you get into the low grade China sheep, you get pretty well into the hair class?—A. A good deal of hair of a very low grade.

Q. When you get China goat sometimes it is rather difficult to tell the difference between China goat and China sheep; they merge very closely?—A. Not at all.

Q. Have you ever been in China?—A. No, sir.

Q. Never seen the China goat on its native heath?—A. No, sir; but I have seen skins with the wool on.

Q. You know, I believe, and would admit that China goat hair frequently contains a woolly growth, doesn't it?—A. An undergrowth.

Q. A woolly undergrowth?—A. A woolly undergrowth, which resembles cashmere; in fact it is cashmere.

Q. Very fine?—A. Very fine.

*        *        *        *        *        *        *

Q. You have admitted that there is considerable hair that grows on the sheep?—A. Oh, yes.

Q. That being so, and sticking to your hypothesis that this grew on a sheep's back, do you deny that there is considerable hair in these samples?—A. Certainly, and that very hair is what fools a great many who are not experts; they think it is all hair.

Q. Isn't it true that most of these samples as they lie there on the table offering them as a commercial proposition, is hair?—A. No; it is wool as a commercial commodity.

Q. Then keeping in mind this distinction that you have drawn between sheep hair and sheep wool, isn't the greater quantity of staple in those samples what you call sheep hair?—A. Well, I will admit that a majority of the fibers there, if they did not grow on sheep, might be considered hair, but I have never seen—I want to correct myself to you—I have never seen an importation of sheep's hair that don't separate it from the wool.

As is stated above, four of the five witnesses examined by the Government were official examiners of merchandise. The fifth witness was James Fee. This witness had been for 17 years the wool buyer for a large carpet manufacturing company in this country, and had bought large quantities of China hair and wool. He had bought the lot of 60 bales now in controversy, the same being sold and billed to him by the importers as China sheep's wool. The witness furthermore testified from his own knowledge and inspection that the article in question was wool.

In rebuttal of the foregoing statement concerning the sale and invoice of the merchandise as sheep's wool, the witness Mote testified that the lot had in fact been quoted and sold to the carpet manufacturing company upon sample and by mark only—namely, "H. K. S. M., 60 bales"—and not under the name either of goat hair or sheep's wool; but afterwards, when the bill and sale notes were made out, he designated the article therein as sheep's wool because of the circumstance that the manufacturing company were in general buyers of wool, and that hair was used as an adulterant only in the manufacture of carpets.

The testimony contained in the record is somewhat voluminous and conflicting, and it is not pretended that the foregoing outline is exhaustive; nevertheless it fairly indicates the grounds upon which the decision of the present issue should be placed. For the evidence considered together makes it appear probable that the merchandise in question in fact consisted of China goat hair, and that the percentage of woolly hair observed therein was simply the undergrowth of immature hair which naturally appears to a greater or less extent in such merchandise. Such undergrowth, although it resembles wool, would not justify the assessment of the merchandise as such. It is true that the present lot of merchandise was billed to a buyer as wool, but the explanation of that fact given by the witness Mote is persuasive. Moreover, if the merchandise was in fact goat hair, a subsequent sale and delivery of part of the importation as wool would not alone prove a commercial designation of the article as wool; nor under the circumstances of this case would it estop the importers from claiming and proving the real character of the importation. Furthermore it appears by uncontradicted testimony that the other lot of merchandise covered by the protest was sold by the importers by sample, number, and marks only; that the purchaser had bought it knowing it to be hair; and it sufficiently appears that the two lots of merchandise, while differing somewhat in value, were identical in character in all substantial particulars. It may also be observed that the testimony of the witness James Fee is somewhat obscured by the fact that he testified generally that the lot now in question was composed of wool, whereas the testimony of the witnesses, including that of the examiners Sievers and Cahill, conclusively shows that the greater bulk of it was concededly hair, and that only a small percentage of it would in fact have been regarded as wool.

The foregoing appraisal of the evidence tends to sustain the conclusion reached by the board. The decision is therefore sustained.

*Affirmed.*